

FILED BY _____ D.C.

JUN 12 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**


ROBIN GREENBAUM,

Plaintiff, pro se,

v.

DR. GAIL BENDHEIM, DR. ESTHER ALTMANN, DR. JONATHAN SLAVIN,

DR. JOSEPH CILONA, DR. ERIN OLIVO, DR. CHRISTINE FOERSTCH,

DR. JONATHAN DETRIXHE, NAOMI BEN-AMI, DR. CHLOE CARMICHAEL,

HILLEL FULD, JOSH WEINER, LINDA WEINER, RABBI ERIN LEIB,

SAUL BIENENFELD, SAUL BIENENFELD P.C., LISA CAHILL, LISA CAHILL P.L.LC.,

ADA COLLEEN WALSH, ADA JAMIE KLEIDMAN,

JASON STEINBERGER, JASON STEINBERGER L.L.C., RABBI JEFF FOX, YESHIVAT

MAHARAT, SAR ACADEMY,

AVENTURA HOSPITAL, DOUGLAS ELLIMAN, KEN HABER, ROOSEVELT HOSPITAL,

JACK BENDHEIM, SARA ROER, ETHAN BENDHEIM, RABBI JOEL COHN,

ELLIOT FULD, ARIEL GROVEMAN WEINER,

1

THE NEW YORK STATE OFFICE OF THE PROFESSIONS,

and JOHN DOES 1–30,

Case No. _____

JURY TRIAL DEMANDED

**TABLE OF CONTENTS**

1. INTRODUCTION

2. JURISDICTION AND VENUE

3. PARTIES

4. FACTUAL BACKGROUND

5. CAUSES OF ACTION

6. DAMAGES DEMAND

7. PRAYER FOR RELIEF

8. LEGAL FOUNDATION FOR CLAIMS

9. OPPOSITION TO IMMUNITY

10. EQUITABLE TOLLING

11. FINAL STATEMENT

12. ANTI-SLAPP

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF (RICO, ADA, HIPAA, §1983, and State Law Claims)**

## INTRODUCTION

1. This is a civil RICO and federal civil rights action brought by Robin Greenbaum, a survivor of childhood abuse and institutional retaliation.

2. Rather than receive support, Plaintiff was betrayed by therapists, threatened by prosecutors, excluded by religious institutions, and harmed by medical and legal systems.

3. Her case spans over two decades and more than two dozen defendants across New York and Florida, including licensed professionals, state actors, and affiliated institutions.

4. What began as an effort to report trauma escalated into a coordinated effort to pathologize, silence, and criminalize her.

5. Plaintiff now seeks redress for a pattern of racketeering, obstruction, discrimination, defamation, and abuse of power—alleging that what happened was not accidental, but systemic.

6. This Court is now asked to examine not only the individual acts of misconduct—but the collective failure of institutions designed to protect the vulnerable.

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 1983 (civil rights), 42 U.S.C. § 12132 (Americans with Disabilities Act), and 18 U.S.C. § 1964(c) (civil RICO). The Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) for the following reasons:

3. Plaintiff currently resides in this District.

4. Plaintiff experienced retaliation, ongoing psychological injury, and medical harm in this District.

5. Aventura Hospital, one of the primary sites of misconduct, is located in this District.

6. Defendants continued to communicate and act against Plaintiff while she was residing here, resulting in ongoing harm.

7. Douglas Elliman, one of the named defendants, maintains offices in South Florida and is subject to personal jurisdiction through its business operations in this District.

8. Defendant Ken Haber, attorney for Douglas Elliman and a named party to this action, resides in South Florida and is individually subject to personal jurisdiction.

## III. PARTIES

9. Plaintiff Robin Greenbaum is a resident of Florida and brings this action pro se.

10. Defendants include therapists, legal actors, institutional actors, clergy, and others who directly or indirectly participated in the events described in this Complaint.

11. For reference, the defendants are categorized as follows:

4

12. **Therapists:**

Dr. Gail Bendheim, Dr. Esther Altmann, Dr. Jonathan Slavin, Dr. Joseph Cilona, Dr. Erin Olivo, Dr. Christine Foerstch, Dr. Jonathan Detrixhe, Naomi Ben-Ami, and Dr. Chloe Carmichael.

13. **Legal Actors:**

Saul Bienenfeld, Lisa Cahill, Assistant District Attorney Colleen Walsh, Assistant District Attorney Jamie Kleidman, Jason Steinberger, Elliot Fuld, and Ken Haber.

14. **Childhood Abusers:**

Josh B. Weiner, Rabbi Erin Leib and Hillel Fuld.

15. **Institutions and Affiliated Individuals:**

SAR Academy, Yeshivat Maharat, St. Luke's Roosevelt Hospital (Now Sinai West), Aventura Hospital, Douglas Elliman, the New York State Office of the Professions, Jack Bendheim (SAR board member), Linda Weiner (appointed SAR abuse care coordinator), and Ariel Groveman (Maharat)

16. **Clergy:**

Rabbi Erin Leib, Rabbi Jeff Fox, and Rabbi Joel Cohn.

17. **Other Related:** Ethan Bendheim and Sarah Roer

18. **Unidentified Parties:**

John Does 1–30 are unidentified individuals or entities whose identities are currently unknown but who participated in the misconduct described herein.

## IV. FACTUAL BACKGROUND

19. Plaintiff was emotionally and sexually abused at SAR Academy by Josh Weiner; emotionally abused by Erin Leib; and emotionally and physically attacked by Hillel Fuld. Josh Weiner and Erin Leib subjected Plaintiff to regular public humiliation, resulting in severe social isolation. As a result, Plaintiff developed selective mutism and PTSD. SAR Academy's negligence contributed significantly to both the psychological trauma and educational disruption that shaped Plaintiff's developmental trajectory.

20. Plaintiff was a minor (age 17) when she began seeing Dr. Gail Bendheim in Bronxville, New York. During therapy, Plaintiff disclosed that she had been the victim of child abuse. As a licensed psychologist and mandatory reporter under New York Social Services Law § 413, Dr. Gail Bendheim was legally and ethically obligated to report this disclosure to the appropriate child protection authorities. Her failure to do so may constitute a violation of state law and grounds for criminal liability under New York Social Services Law § 420, which permits both civil and criminal penalties for mandated reporters who willfully fail to report suspected child abuse. Instead of fulfilling this duty, Dr. Bendheim ultimately withdrew care and, years later, called the police when Plaintiff sought accountability and repair. This pattern of abandonment, retaliation, and obstruction compounded the original trauma and formed the basis for the coordinated cover-up alleged in this action.

21. Dr. Esther Altmann became Plaintiff's next therapist. During therapy, Plaintiff disclosed that she had been the victim of child abuse. Rather than addressing the underlying trauma, Altmann reframed Plaintiff's symptoms as pathological

"over-attachment." Following termination, Altmann colluded with Bendheim by sharing confidential records and aligning against Plaintiff, acting in concert with a retaliatory agenda rather than in accordance with her professional responsibilities.

22. Coercive Prosecution and Misinterpreted Mutism: In 2013, prosecutors—including ADA Colleen Walsh and ADA Jamie Kleidman—threatened Plaintiff with involuntary psychiatric confinement. This threat was made despite: no evidence of current dangerousness (in violation of NY Mental Hygiene Law § 9.39) Plaintiff's lifelong under diagnosed selective mutism, which had been repeatedly misinterpreted as manipulative behavior. A lack of medical evaluation prior to prosecutorial escalation, potentially violating NY Judiciary Law § 509.

23. Plaintiff was told by her attorneys that Walsh and Kleidman threatened that she better quality for Roosevelt Hospitals Center for Intensive Treatment of Personality Disorders (CITPD) so that Walsh could track and monitor compliance or face felony charges.  This violated her rights under: NY Penal Law § 135.60 (coercion) NY Rules of Professional Conduct 3.8 (ethical duties of prosecutors) The Eighth and Fourteenth Amendments (cruel and unusual punishment and due process).

24. The psychological coercion and stigma resulting from the criminalization of trauma-related suicidal ideation made it unsafe for Plaintiff to speak honestly in therapy. Assistant District Attorney Colleen Walsh demanded the appearance of therapeutic compliance, while demonstrating no understanding of the therapeutic

process or the nature of trauma disclosure. This weaponization of mental health care caused severe emotional and psychological harm compounded by therapists who bowed to power versus understanding the nature of what the Plaintiff was suffering from. Plaintiff experienced this not as justice, but as cruel and unusual punishment—not for any crime, but for her vulnerability and desperation for help.

25. Plaintiff's attorney, Elliot Fuld, was forced to intervene when therapists at Roosevelt Hospital attempted to condition Plaintiff's discharge and treatment progress on her expressing remorse for how she had "treated" Dr. Gail Bendheim and Dr. Esther Altmann. This coercive demand—that Plaintiff emotionally recant her valid grievances and cry over the perceived pain of her abusers—was framed as a therapeutic necessity for being considered "cured." These actions constituted psychological manipulation, retraumatization, and a gross violation of clinical ethics. Moreover, they amounted to state-sanctioned emotional coercion and violated Plaintiff's constitutional right not to be subjected to cruel and unusual punishment, as protected under the Eighth and Fourteenth Amendments.

26. School records and behavioral evaluations throughout Plaintiff's childhood consistently documented zero incidents of aggression. Plaintiff was notably withdrawn and largely submissive due to selective mutism, a condition that was outwardly observable even if not formally diagnosed at the time. Her demeanor was marked by compliance and emotional inhibition, contradicting any later efforts to pathologize her as threatening or violent.

27. Professionals across disciplines had pathologized her survival responses, rather than address the abuse she reported

28. Plaintiff was later falsely charged with harassment and stalking—devoid of context—after persistently seeking truth and repair. At the urging of the therapists, Assistant District Attorneys Colleen Walsh and Jamie Kleidman violated Plaintiff's civil rights by threatening felony prosecution and coercing psychiatric compliance. Their actions constituted legal retaliation, untethered from objective evidence or corroborating facts.

29. Plaintiff's own attorney, Jason Steinberger — a former ADA who had an undisclosed prior relationship with Defendant Colleen Walsh — failed to advocate in her interest, instead aligning with Walsh's prosecutorial framing of the case. This conflict of interest undermined Plaintiff's defense, deprived her of fair representation, and facilitated Walsh and Kleidman's retaliatory prosecution.

30. Multiple therapists subsequently denied Plaintiff services based on stigma, rumor, and professional bias. Despite Plaintiff's insight, intelligence, and peaceful conduct, these clinicians refused repair and instead pathologized her. They failed to recognize or accommodate Plaintiff's neurodivergent needs —specifically, selective mutism and Autism—and used her trauma-related communication style to justify exclusion rather than support.

31. Yeshivat Maharat employed or was affiliated with Dr. Esther Altmann and Rabbi Erin Leib, both of whom harmed or retaliated against Plaintiff. Maharat supported or ignored Altmann's dual relationship with Plaintiff's abuser and failed to address post-termination misconduct, including participation in a coordinated legal

intimidation effort. Despite Maharat's stated mission of advancing women's justice and leadership, the institution ignored Plaintiff's whistleblowing, blocked her communication, and failed to uphold its ethical obligations. Rabbi Jeff Fox, a Maharat leader, engaged in third-party whistleblower intimidation and witness tampering by contacting Plaintiff's family.

32. Plaintiff alleges that the individuals and institutions named in this suit are part of a deeply connected network of wealth, power, and institutional influence. Defendant Jack Bendheim is CEO of Phibro, a NASDAQ-listed company, cousins of the Reichmann family — one of the first Orthodox Jewish billionaire dynasties. He is a major political donor and former chair of AIPAC, with longstanding financial ties to top Democratic figures including the Clintons. The Bendheims have donated over $6 million to SAR Academy, where he serves as a board leader. His daughter is married into the Zakheim family, which holds high-ranking State Department connections. Another daughter, Shuli, is married to Avi Steinlauf, former CEO of Edmunds.com, one of the most influential automotive data and media companies in the United States. The Steinlauf family is prominent in corporate media and digital advertising, and their wealth and industry influence further reflect the elite social circle that surrounds Dr. Bendheim. These connections place Bendheim and her family at the intersection of political, religious, and philanthropic institutions, where she frequently presents herself as a feminist leader and advocate for vulnerable women. This public image stands in stark contrast to her actual conduct, which includes the abandonment and silencing of a patient who disclosed child abuse.

33. Defendant Josh Weiner, whose abuse of Plaintiff began in childhood, is connected to this network both through proximity (the Bendheims are his neighbors and close family friends) and through marriage. His wife is the granddaughter of the Belz family, a billionaire Orthodox real estate dynasty known for assets such as the Piedmont Hotel in Tennessee.

34. Dr. Esther Altmann is married to Richard Cantor, the longtime Chief Risk Officer at Moody's, one of the three dominant credit rating agencies whose actions contributed to the 2008 financial crisis. Cantor testified before Congress during investigations into the real estate collapse, defending Moody's issuance of inflated credit ratings for mortgage-backed securities that later defaulted en masse. This association places Dr. Altmann within elite financial and political networks that wield extraordinary institutional power. Plaintiff alleges that proximity to unaccountable power has helped shield Altmann from professional consequences, even as she engaged in unethical conduct, dual relationships, and collusion against a former patient. The fact that Altmann's inner circle includes individuals involved in one of the largest regulatory failures in U.S. history only deepens concern over the systemic protection she has enjoyed. Plaintiff believes Dr Altmann's compensation for her betrayal of Plaintiff was rewarded with the position of director of Pastoral Education at Maharat via Dr Bendheim's influence who is a major "builder" donor of Maharat.

35. These relationships formed the backbone of a retaliatory machine that Plaintiff contends was deployed not to seek truth or justice, but to protect reputation, privilege, and power. The conspiracy to silence her—through therapy abuse,

false arrest, defamation, and blacklisting—was not accidental. It was a deliberate misuse of institutional systems by individuals with extraordinary access to legal, political, and social capital.

36. Dr. Gail Bendheim's brother, Rabbi Rafael Butler, formerly held a senior leadership position at the Orthodox Union (OU), one of the most prominent Orthodox Jewish institutions in the United States. Rabbi Butler resigned in the wake of the Baruch Lanner sexual abuse scandal, after it was revealed that he failed to act on numerous credible allegations of child sexual abuse spanning years. His resignation followed public outcry over the OU's institutional mishandling and concealment of abuse reports. This background further contextualizes Dr. Bendheim's own failure to report Plaintiff's childhood abuse and instead retaliate against her, reinforcing the pattern of abuse concealment and protection of institutional actors that is central to Plaintiff's RICO claims.

37. Dr. Bendheim and Dr. Altmann's joint attorney Saul Bienenfeld represented Chevy Garfinkel, another accused sexual orthodox Jewish sexual predator.

38. Upon information and belief, Ken Haber was acting within the scope of his authority as counsel to Douglas Elliman, and his discriminatory recommendation to terminate Plaintiff was adopted by the company, making Elliman jointly and severally liable.

39. Attorneys Lisa Cahill and Saul Bienenfeld sent defamatory and threatening cease-and-desist letters, mischaracterizing Plaintiff's protected speech and attempting to intimidate her into silence.

40. While residing in Florida, Plaintiff was drugged without informed consent and physically assaulted by Aventura hospital staff. The hospital failed to protect her civil rights and subjected her to unlawful medical abuse, including the use of excessive force and illegal isolation.

41. Despite holding a Certificate of Relief, Plaintiff was terminated from her longtime job of approximately twelve years, reflecting systemic blacklisting and employment discrimination. Defendant Ken Haber, acting as corporate counsel, should be held personally liable. He circumvented normal review procedures, falsely misrepresented facts and pressured her manager, Jeff Rothstein to lie. Haber overrode the judgment of senior personnel including Dottie Herman —resulting in Plaintiff's unjust termination.

42. The New York State Office of the Professions (OP), tasked with licensing and disciplining mental health providers, repeatedly failed to follow its own procedures. Plaintiff submitted timely and well-documented complaints against Dr. Gail Bendheim, Dr. Esther Altmann, and Dr. Chloe Carmichael. OP delayed, ignored, or dismissed these complaints without meaningful investigation. This regulatory failure allowed unethical practitioners to continue harming the Plaintiff and others. The OP's inaction constitutes state-enabled obstruction and supports Plaintiff's civil RICO and civil rights claims.

43. Defendant Colleen Walsh, acting under color of law, made the false and discriminatory assertion that Plaintiff could 'never get better.' She was not medically qualified to make such a determination. The statement was made recklessly, with no clinical basis, and was used to justify punitive legal action.

Such conduct reflects disability-based animus and deliberate indifference, in violation of the ADA, the Rehabilitation Act, and 42 U.S.C. §1983.

44. Notably, Defendant Walsh and Kleidman now hold a position of authority adjudicating discrimination cases at Columbia University — despite having previously retaliated against a vulnerable whistleblower reporting childhood abuse. This contradiction speaks directly to the reputational harm, moral injury, and systemic injustice at the core of this case.

45. Police Intimidation via Saul Bienenfeld: Attorney Saul Bienenfeld caused law enforcement to be dispatched to Plaintiff's residence in Florida after Plaintiff reported misconduct. This act of sending police to her door, under false pretense and outside jurisdictional norms, was an act of harassment and witness intimidation in violation of 18 U.S.C. §1512 and §1951.

46. Coordinated Legal Threats via Cahill Letter: Attorney Lisa Cahill, purporting to represent licensed therapists, abusers, and SAR Academy's abuse coordinator simultaneously, issued a cease-and-desist letter threatening Plaintiff for protected whistleblowing speech. This letter misrepresented facts, attempted to silence ongoing public interest reporting, and represented a textbook example of legal extortion under the Hobbs Act (18 U.S.C. §1951), using institutional affiliation and legal threats to stifle lawful expression as well as witness tampering as this letter was sent to Plaintiff's father who is not involved.

47. Witness Tampering via Rabbi Jeff Fox: Rabbi Jeff Fox contacted Plaintiff's brother with the apparent goal of pressuring or influencing Plaintiff's behavior through family dynamics. The outreach came after Plaintiff's reports of

misconduct and is understood as a method of third-party pressure and indirect

tampering designed to isolate, discredit, or suppress her.

48. SAR Academy's failure to protect Plaintiff is not an isolated incident. The

institution has a documented history of hiring, retaining, and protecting

individuals engaged in serious misconduct, including: Rehiring a known sex

offender with full knowledge of prior allegations; Employing a vice principal who

was later convicted and sentenced to 15 years in prison for criminal sexual

conduct.

49. This history demonstrates SAR's deliberate indifference to the safety of its

students and community members, establishing a pattern of reckless institutional

behavior. It also supports Plaintiff's claim that SAR, in the present case, acted in

conformity with a longstanding internal culture of concealment, retaliation, and

reputational protectionism — rather than transparency or survivor

protection.Such a pattern satisfies the predicate elements of: Civil RICO

enterprise liability (18 U.S.C. § 1962(c)), where SAR acted as a continuing unit

with others to suppress exposure; Negligent supervision and retention under

New York law (see Doe v. Roman Catholic Diocese of Rochester, 12 N.Y.3d 764

(2009)).

## V. CAUSES OF ACTION

### 50. Count I – Civil RICO (18 U.S.C. § 1962(c))

51. Pattern of mail/wire fraud, obstruction, witness tampering, and extortion.

52. Plaintiff alleges a pattern of racketeering activity by multiple defendants involving

extortion, mail and wire fraud, obstruction of justice, and witness intimidation.

These acts constitute predicate offenses under 18 U.S.C. § 1961(1), and together establish an enterprise under 18 U.S.C. § 1962(c).

53. Extortion by Prosecutors:

Prosecutors Colleen Walsh and Jamie Kleidman threatened Plaintiff with felony charges, psychiatric confinement, and criminal labeling—under color of official authority. These threats were made not to prevent imminent harm but to coerce silence regarding therapist misconduct. The conduct invoked fear of incarceration and reputational ruin to extract compliance, satisfying the "color of official right" and coercive threat elements of extortion under 18 U.S.C. § 1951.

54. Cease-and-Desist Letters by Attorneys Cahill and Bienenfeld:

Attorneys Lisa Cahill and Saul Bienenfeld sent communications falsely portraying Plaintiff as dangerous and criminal. These were not neutral legal notices but threats aimed at silencing protected whistleblower speech. Their intent was to create legal and psychological fear, amounting to financial and reputational coercion.

55. Police Threats by Therapists Bendheim and Altmann:

Therapists Dr. Gail Bendheim, Dr. Esther Altmann and Dr Erin Olivo threatened Plaintiff with police involvement post-termination. These threats were retaliatory and manipulative, exploiting their professional authority to avoid accountability and suppress Plaintiff's reports of prior misconduct.

56. Employment Retaliation:

Following the defamation and criminalization of Plaintiff, Douglas Elliman terminated her employment. Prosecutor Colleen Walsh explicitly told Plaintiff's

attorney she did not care if Plaintiff lost her job, as long as the therapists were protected. This coercive use of stigma and misinformation caused severe financial and reputational harm.

57. Obstruction and Abuse of Process via False Arrest In 2018, Plaintiff was falsely arrested after attending an SAR community  alumni event associated with SAR Academy, where Dr. Gail Bendheim was present. Dr. Bendheim made materially false statements to law enforcement, including that her husband was the principal of SAR (he was not).

58. These misrepresentations were used to manufacture probable cause, leading to Plaintiff's arrest for nonviolent behavior—allegedly "looking at" Dr. Bendheim. The arrest was later resolved with a civil rights settlement. The arrest served no legitimate public safety interest and was clearly retaliatory, aimed at further harming Plaintiff's credibility in reporting misconduct. This act constitutes obstruction of justice under 18 U.S.C. § 1503 and 1512(b), and abuse of process under state law. It also supports the pattern of racketeering activity through coordinated misuse of government and legal systems for retaliatory purposes.

59. Coerced Plea and Weaponized Order of Protection (2012–2018) In 2014, during a period of psychological collapse following years of therapy abuse and retaliation, Plaintiff was coerced into accepting a plea deal that included a five-year order of protection—despite no allegations of violence or familial relationship. Prosecutors, including Colleen Walsh, used stigma and threat of felony prosecution to extract this plea, weaponizing the judicial process against a vulnerable whistleblower.

60. In 2018, this order was invoked to justify Plaintiff's false arrest for merely
attending a public SAR event. Defendant Gail Bendheim lied to police, claiming
her husband was the school principal and that Plaintiff was "crashing a private
party." The arrest was not supported by facts, but rather by a decade-old
protective order rooted in coercion and stigma. This misuse of legal process,
compounded by false statements, ineffective counsel in 2013 and institutional
interference, constitutes obstruction of justice and retaliatory extortion under
RICO.

**Count II – RICO Conspiracy (18 U.S.C. § 1962(d))**

61. Defendants entered into an agreement—explicit or implicit—to engage in conduct
violating 18 U.S.C. § 1962(c). Each defendant played a role in silencing Plaintiff,
obstructing justice, and preserving institutional reputations, thereby furthering the
enterprise's unlawful objectives.

62. Enterprise Coordination in Legal Retaliation- Defendants collaborated across
institutions — including therapists, attorneys, and prosecutors — to impose and
later reactivate an exaggerated legal restraint against Plaintiff. The 2014 order of
protection was never grounded in threat or violence, but in protecting reputational
interests of politically connected therapists. Its use in 2018 to justify arrest shows
continuity of the enterprise's goal: suppressing Plaintiff's voice through
criminalization, stigma, and institutional force. This pattern supports the existence
of a coordinated RICO conspiracy.

**Count III – Americans with Disabilities Act (42 U.S.C. § 12132)**

63. Plaintiff was denied medical and therapeutic services due to stigma surrounding her neurodivergent traits, trauma history, and protected disabilities (including PTSD, Autism, and selective mutism). Defendants discriminated against Plaintiff by refusing treatment, engaging in retaliatory exclusion, and failing to accommodate her disability.

## Count IV – HIPAA Violations / State Confidentiality Law

64. Defendants, including Dr. Esther Altmann, Dr. Gail Bendheim, and others, unlawfully disclosed Plaintiff's confidential mental health records to prosecutors and third parties without consent, in violation of HIPAA and applicable state privacy statutes.

## Count V – Malpractice / Breach of Fiduciary Duty

65. Licensed therapists breached their professional duty through acts of abandonment, dual relationships, collusion with prosecutors, and denial of care based on bias. These breaches violated the ethical and legal standards governing the mental health profession.

## Count VI – Intentional Infliction of Emotional Distress

66. Defendants engaged in outrageous conduct—including retaliatory prosecution, coercive psychiatric threats, and coordinated public defamation—intended to cause severe emotional distress. The resulting trauma was foreseeable, extreme, and ongoing.

67. Coordinated Communications as Overt Acts in Furtherance of Conspiracy: Each of the above mentioned actions — including the coordinated cease-and-desist letter, the false arrest instigated by Dr. Bendheim, Saul Bienenfeld's unlawful police dispatch, and Rabbi Fox's back-channel contact — constitute overt acts in furtherance of the shared enterprise. The goal was to obstruct Plaintiff's access to justice, suppress speech, and protect reputational and financial interests of those implicated in abuse and cover-up.

## Count VII – Defamation

68. Defendants made and disseminated knowingly false statements to third parties—including other therapists, prosecutors, lawyers and regulatory agencies—characterizing Plaintiff as dangerous, unstable, and dishonest. These statements directly harmed Plaintiff's reputation and employability.

## Count VIII – Civil Rights Violations (42 U.S.C. § 1983)

69. State actors, including Colleen Walsh and Jamie Kleidman, violated Plaintiff's First and Fourteenth Amendment rights by retaliating against protected speech and due process. They acted under color of law to silence a whistleblower and protect institutional actors.

## Count IX – Civil Conspiracy (State Law)

70. Defendants engaged in a coordinated effort to defame, silence, exclude, and economically destabilize Plaintiff across multiple professional sectors. This agreement constitutes a civil conspiracy under state law.

## VI. DAMAGES DEMAND

71. Plaintiff seeks the following compensatory damages against each defendant, based on their individual roles, actions, and levels of harm inflicted:

| Defendant / Entity | Amount |
| --- | --- |
| Dr. Gail Bendheim | $10,000,000 |
| Dr. Esther Altmann | $7,500,000 |
| Josh Weiner | $5,000,000 |
| Rabbi Erin Leib | $2,000,000 |
| Linda Weiner | $5,000,000 |
| Dr. Jonathan Slavin | $5,000,000 |
| Dr. Joseph Cilona | $2,000,000 |

| | |
|---|---|
| **Dr. Erin Olivo** | $2,000,000 |
| **SAR Academy** | $40,000,000 |
| **Yeshivat Maharat** | $2,000,000 |
| **St. Luke's Roosevelt Hospital** | $10,000,000 |
| **Aventura Hospital** | $10,000,000 |
| **Dr. Chloe Carmichael** | $2,000,000 |
| **Dr. Christine Foerstch** | $50,000 |
| **Dr. Jonathan Detrixhe** | $250,000 |
| **Naomi Ben-Ami** | $1,000,000 |
| **ADA Colleen Walsh** | $12,000,000 |

| | |
|---|---|
| **ADA Jamie Kleidman** | $8,000,000 |
| **Jason Steinberger** | $1,000,000 |
| **Law Office of Jason A. Steinberger, LLC** | $1,000,000 |
| **Douglas Elliman** | $2,000,000 |
| **Jack Bendheim** | $5,000,000 |
| **Hillel Fuld** | $1,000 |
| **NY State Office of the Professions** | $5,000,000 |
| **Ken Haber** | $1,000,000 |
| **Saul Bienenfeld** | $1,000,000 |

**Law Offices of Saul Bienenfeld, P.C.**      $1,000,000

**Lisa Cahill**                               $1,000,000

**Lisa Cahill, PLLC**                         $1,000,000

72. WHEREFORE, Plaintiff Robin Greenbaum respectfully requests that this Court
    enter judgment in her favor and against Defendants, jointly and severally, and
    grant the following relief:

73. Compensatory damages in the amount of $142,801,000, for personal,
    professional, reputational, emotional, and financial harm suffered as a result of
    Defendants' unlawful conduct;

74. Treble damages pursuant to 18 U.S.C. § 1964(c), in the amount of $428,403,000,
    based on the pattern of racketeering activity committed by the RICO Defendants;

75. Punitive damages against individual Defendants whose conduct was willful,
    malicious, or recklessly indifferent to Plaintiff's rights, in an amount to be
    determined at trial;

76. Declaratory judgment that the conduct of Defendants violated Plaintiff's rights
    under the U.S. Constitution, the Americans with Disabilities Act, HIPAA, and
    federal RICO statutes;

**VII. Prayer For Relief:**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1. Injunctive Relief:

   a. Removal or suspension of Defendants from positions of public trust and/or professional licensure;

   b. A prohibition against further retaliation or dissemination of defamatory material;

   c. A court-ordered preservation of all relevant records and communications relating to Plaintiff.

2. Compensatory and Treble Damages:

   a. Compensatory damages in the amount of $142,801,000;

   b. Treble damages under 18 U.S.C. § 1964(c), totaling $428,403,000.

3. Punitive Damages:

   a. An award of punitive damages, in an amount to be determined by a jury, to deter future misconduct of this scale.

4. Declaratory Relief:

   a. A formal judicial declaration that the coordinated conduct of Defendants violated Plaintiff's constitutional and statutory rights.

5. Attorneys' Fees and Costs:

   a. Reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), 42 U.S.C. § 1988, and other applicable provisions, should Plaintiff retain counsel.

6. Additional Relief:

a. Any further relief this Court deems just and proper in light of the facts, law, and public interest.

## VIII. LEGAL FOUNDATION FOR CLAIMS

**Plaintiff's claims arise under the following established legal authorities:**

FEDERAL CLAIMS

1. Civil RICO (18 U.S.C. § 1962(c))

　• Pattern of racketeering through mail/wire fraud (Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 495-96 (1985))

　• Direct causation of injuries (Hemi Group, LLC v. City of New York, 559 U.S. 1, 9-10 (2010))

2. ADA Violations (42 U.S.C. § 12132)

　• Unlawful discrimination against disabled plaintiff (Olmstead v. L.C., 527 U.S. 581, 600-02 (1999))

3. § 1983 Prosecutorial Misconduct

　• Investigative acts outside immunity protection (Buckley v. Fitzsimmons, 509 U.S. 259, 273-76 (1993))

NEW YORK STATE CLAIMS

4. Medical Malpractice

　• Breach of psychiatric care standards (Doe v. Guthrie Clinic, Ltd., 22 N.Y.3d 480, 485-87 (2014))

5. Intentional Infliction of Emotional Distress

• Extreme and outrageous conduct by professionals (Howell v. N.Y. Post Co., 81

N.Y.2d 115, 121-22 (1993))

6. Defamation

• False statements causing reputational harm (Dillon v. City of N.Y., 261 A.D.2d 34,

38-39 (1st Dept. 1999))

- Florida Medical Battery (FL Stat. § 456.50)

  - *Sovereign Healthcare v. Gutierrez*, 983 So.2d 717 (Fla. 3d DCA 2008)

(unconsented treatment)

- Florida False Imprisonment

  - Willner v. Costello, 714 So.2d 251 (Fla. 3d DCA 1997) (unlawful psychiatric hold)

---

## IX. OPPOSITION TO DEFENDANT COLLEEN WALSH'S CLAIM OF IMMUNITY

77. Defendant ADA Colleen Walsh is expected to assert absolute or qualified immunity in response to Plaintiff's claims under 42 U.S.C. §1983 and the Racketeer Influenced and Corrupt Organizations Act (RICO). However, the conduct alleged in this Complaint falls outside the scope of protected prosecutorial discretion and instead reflects investigative misconduct, unlawful retaliation, and collusive suppression of protected speech. These acts are actionable under federal law.

78. Prosecutors are granted absolute immunity only for actions "intimately associated with the judicial phase of the criminal process," such as initiating and pursuing criminal charges. (Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). By contrast, when acting in an investigative, administrative, or retaliatory role—especially

outside the courtroom or prior to filing charges—prosecutors are only eligible for qualified immunity, which does not apply when constitutional rights are violated.

79.. In Buckley v. Fitzsimmons, 509 U.S. 259 (1993), the Supreme Court held that prosecutors are not immune for fabricating evidence, coercing cooperation, or making defamatory public statements to discredit a target before formal prosecution. Such acts, when taken in a non-advocacy role, are treated as investigative in nature and do not qualify for immunity.

80. ADA Walsh's actions, as alleged herein, were not judicial but retaliatory.

    a.  They included:

    b.  Threatening Plaintiff with felony charges for protected speech and contacting therapists, in order to chill further reporting of misconduct;

    c.  Stating that she "did not care" if Plaintiff lost her job and affirming that her only goal was to protect therapists—not the public;

    d.  Misusing prosecutorial authority to coerce psychiatric compliance despite no risk to self or others;

    e.  Refusing to enter exculpatory evidence (Plaintiff's phone) into the record, which could have disproven key allegations.

81. These actions were undertaken not in the course of a legitimate prosecution, but as part of a coordinated effort to silence, discredit, and retaliate against a survivor of institutional abuse. They reflect a personal and political agenda—driven by private interests—and are not protected under Imbler or Buckley.

82. Walsh also knowingly suppressed exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), by failing to enter Plaintiff's confiscated phone into evidence or subpoena location data that could have disproven claims of trespass at Dr. Bendheim's residence. This deliberate omission—used to justify criminal charges—constitutes prosecutorial misconduct.

83. Even under the more lenient doctrine of qualified immunity, Walsh's conduct fails to meet the standard. The constitutional rights at issue—freedom of speech, due process, and equal protection for individuals with psychiatric or neurological disabilities—were well-established at the time.

84. A reasonable prosecutor would have known that:

    a. Retaliating against a whistleblower violates §1983;

    b. Using the threat of felony prosecution to suppress speech violates the First Amendment;

    c. Collaborating with private actors to criminalize trauma reporting violates due process.

85. Walsh's conduct also constitutes predicate acts under RICO, including:

    a. Wire Fraud (18 U.S.C. §1343) – use of electronic communications to further a retaliatory scheme;

    b. Mail Fraud (18 U.S.C. §1341) – dissemination of legal notices and filings to suppress Plaintiff's rights;

    c. Obstruction of Justice (18 U.S.C. §1512) – coordinated suppression of evidence and witness coercion;

      d.  Extortion Under Color of Official Right (18 U.S.C. §1951) – use of prosecutorial threats to extract compliance and silence.

86. Predicate Act Summary:

Defendant: ADA Colleen Walsh

Dates: 2012–2018

Conduct: Coordinated with therapists and their attorney to retaliate against Plaintiff for reporting abuse; used threats, legal coercion, and evidentiary suppression to damage Plaintiff's credibility and career.

Injury: Loss of employment, reputational damage, emotional distress, psychiatric injury.

Supporting Law:

      a.  Buckley v. Fitzsimmons, 509 U.S. 259 (1993): No immunity for retaliatory or investigative conduct.

      b.  Brady v. Maryland, 373 U.S. 83 (1963): Due process violation for failure to disclose exculpatory evidence.

      c.  United States v. Mazzei, 700 F.2d 85 (2d Cir. 1983): Use of mail and wire in a conspiracy to deprive civil rights.

87. The Plaintiff also notes that the Manhattan District Attorney's Office has been the subject of federal investigation by the FBI for selectively declining prosecution in cases involving powerful defendants, substantiating the claim that ADA Walsh acted not in the public interest, but in defense of institutional allies.

88. Plaintiff respectfully requests that the Court deny any motion to dismiss based on immunity and allow all claims against ADA Colleen Walsh to proceed under 42 U.S.C. §1983 and 18 U.S.C. §1962.

## X. EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

A. Misinterpretation and Suppression of Disability

Therapists, prosecutors, and institutional actors failed to recognize the neurological and trauma-based origins of Plaintiff's communication challenges — particularly her selective mutism and traits consistent with autism spectrum disorder. Instead, they consistently mischaracterized her as unstable, manipulative, or emotionally dangerous. This framing distorted how others treated her and justified abusive clinical and legal actions, including psychiatric confinement, legal threats, and social exclusion.

- These professionals: Ignored or misinterpreted signs of neurodivergence,
- Used her mutism as justification for isolation and escalation,
- Pathologized her distress while concealing their own misconduct,
- And reinforced a false narrative that discouraged investigation into the true causes of her suffering.

B. 2025 AI Pattern Recognition and Discovery

It was not until 2025 that Plaintiff, in the absence of clinical support, began using AI tools to analyze her years of written communication. These tools — free of human bias or allegiance — identified consistent patterns that had gone ignored:

- Emotional precision,

- Social exhaustion,

- Shutdowns under stress,

- And communication shaped by trauma and neurodivergence, not pathology.

This marked the first time Plaintiff could clearly see the full pattern of misdiagnosis, gaslighting, and institutional betrayal. The professionals tasked with helping her had instead weaponized her disability, and it had taken AI — not therapy — to uncover the truth.

C. Legal Tolling Justification

Because Plaintiff:

- Was operating under misdiagnoses,
  Internalized the belief that something was wrong with her, and

- Relied on the authority of those who harmed her, she could not reasonably have discovered the full extent of the injury or conspiracy until 2025. This qualifies for tolling under:

Federal Law:

    a.  Bailey v. Glover, 88 U.S. 342 (1874) – Tolling for concealed harm

    b.  Holmberg v. Armbrecht, 327 U.S. 392 (1946) – Equitable principles apply to federal claims

New York Law:

   c.  Doe v. Roman Catholic Diocese of Rochester, 12 N.Y.3d 764 (2009) –
     Tolling when evidence is controlled by defendants

   d.  CPLR 214-a – Tolling under continuous treatment doctrine (e.g., Altmann
     & Bendheim's therapeutic influence)

Florida Law:

   e.  Hearndon v. Graham, 767 So.2d 1179 (Fla. 2000) – Tolling where trauma
     prevents timely comprehension

## XII. FINAL STATEMENT OF CLAIM

89. This is a case about systemic abuse of power. Plaintiff alleges that licensed
therapists, prosecutors, and affiliated actors formed a coordinated enterprise to
retaliate against her for reporting childhood abuse. Rather than receive help, she
was pathologized, abandoned, defamed, and ultimately criminalized.

Her Complaint alleges:

- A pattern of racketeering activity in violation of 18 U.S.C. § 1962;
- Retaliatory prosecution and civil rights violations under 42 U.S.C. § 1983;
- Discrimination under the Americans with Disabilities Act;
- Privacy violations under HIPAA;
- Defamation, breach of fiduciary duty, and intentional infliction of emotional
distress;
- And retaliatory termination by employers influenced by the misconduct.

90. This is not a case about one bad therapist or one false charge. It is about a system that failed — and punished — the person who tried to hold it accountable. Plaintiff brings this action not only for justice, but to affirm that such institutional collusion must not be tolerated.

91. This case presents novel issues of systemic accountability, disability discrimination, and retaliatory enterprise conduct that warrant judicial attention beyond individual redress. The Court has the opportunity to clarify emerging standards in RICO, ADA, and trauma-informed equitable tolling.

92. **Note: These matters are also the subject of active filings with state and federal oversight bodies, including AG Case #25-023687 and an IRS whistleblower submission #2025-006595

93. In the alternative, should any portion of this Complaint be found insufficient, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a)(2), in the interest of justice and judicial economy.

94. In the alternative, should any claim against a government defendant be dismissed on immunity grounds, Plaintiff respectfully requests leave to amend consistent with the Court's findings to preserve remaining claims against all private and institutional actors.

Respectfully submitted,

Robin Greenbaum

Plaintiff, pro se

3370 NE 190th St, APT 807
AVENTURA, FLORIDA
33180

34